UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
MARIO RAMOS,                            :          09 Civ. 3500 (DLC)
                          Petitioner,   :
                                        :          98 Cr. 1038 (SWK)
              -v-                       :
                                        :
UNITED STATES OF AMERICA,               :          OPINION & ORDER
                                        :
                          Respondent.   :
                                        :
----------------------------------------X

APPEARANCES:

For Petitioner:

Mario Ramos
#52120-054
Low Security Correctional Institution, Allenwood
P.O. Box 1000
White Deer, PA 17887

Bobbi C. Sternheim
Rochman Platzer Fallick Sternheim Luca & Pearl, LLP
156 Fifth Avenue
New York, NY 10017

For Respondent:

Justin A. Anderson
Assistant United States Attorney
United States Attorney's Office
One St. Andrews Plaza
New York, NY 10007

DENISE COTE, District Judge:

    Pro se petitioner Mario Ramos ("Ramos") seeks a writ of

habeas corpus pursuant to 28 U.S.C. § 2255, attacking his

narcotics conspiracy conviction following a jury trial held in

March 2006 before the Honorable Shirley Wohl Kram, District

Judge.  Ramos contends that his conviction was flawed because he was denied effective assistance of counsel during pretrial, trial, and sentencing proceedings.  For the following reasons, the petition is denied in its entirety.

BACKGROUND

On September 24, 1998, Ramos and fifteen co-defendants were indicted on the single charge that they conspired to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A)(ii), and 846 (the "indictment").  Arrest warrants were issued for Ramos's arrest on September 14 and October 1, 1998.  All but four of the defendants charged in the indictment pleaded guilty in 1999 and 2000 and were sentenced.  Two of the co-defendants remain fugitives, and a third jumped bail and remains at large.  Ramos was not arrested until about March 2, 2004, more than five years after the warrants for his arrest were issued.  On June 9, 2004, pursuant to a plea agreement negotiated between the Government and Ramos's then-defense counsel ("prior counsel"), Ramos pleaded guilty to the sole count contained in the 1998 indictment.

The week following his guilty plea, on June 18, Ramos wrote a letter to Judge Kram expressing dissatisfaction with prior counsel, alleging that prior counsel "pressured [Ramos] from the

2

very beginning into accepting a plead [sic] bargain agreement which [Ramos] was always against."  Ramos also stated that he had not been given an opportunity to review the 3500 material prior to entering his guilty plea, a request he had made of prior counsel.  Ramos's letter asked that he be permitted to withdraw his plea of guilty so that he could "defend [him]self by having a fair trial."

A conference was held on July 7, 2004 to address the concerns raised by Ramos in his letter.  Ramos explained that he wished to be appointed a new attorney, and the court then relieved prior counsel.  Ramos's new attorney, Richard B. Lind ("counsel" or "defense counsel"), was appointed later that day. Throughout the summer and fall of 2004, counsel engaged in further plea negotiations with the Government that resulted in multiple adjournments of scheduled status conferences.  With counsel's assistance, on December 27, 2004, Ramos formally moved to withdraw his plea of guilty.  That motion was granted by Opinion and Order of January 20, 2005.  United States v. Ramos, No. 98 Cr. 1038 (SWK), 2005 WL 120230 (S.D.N.Y. Jan. 20, 2005) (the "January 20 Order").  Thereafter, plea negotiations continued throughout the following twelve months on an occasional basis, and the originally scheduled trial date of July 2005 was adjourned multiple times.

On February 6, 2006, Ramos moved to dismiss the indictment on the ground that the five-and-a-half-year delay between his indictment and arrest violated the Speedy Trial Act, 18 U.S.C. § 3161 et seq., and his Sixth Amendment right to a speedy trial (the "February 6 motion").  Following a hearing on February 17, 2006 at which both Ramos and the Government presented witness testimony and other evidence, Judge Kram denied the February 6 motion by Opinion and Order of February 28, 2006.  United States v. Ramos, 420 F. Supp. 2d 241 (S.D.N.Y. 2006) (the "February 28 Opinion").

On February 17, the United States Attorney filed a prior felony offender information pursuant to 21 U.S.C. § 851(a).  The prior felony was a May 1991 conviction in New York state court for attempted criminal sale of a controlled substance in the third degree, a Class C felony, for which Ramos was sentenced to time served and a five-year term of probation.  The filing of the prior felony information had the effect of enhancing the mandatory minimum sentence, if Ramos were convicted, from 10 years to 20 years as provided by 21 U.S.C. § 841(b)(1)(A).

Following other pretrial motion practice, jury selection began on February 28, 2006, and trial began on March 1.  The Government's evidence -- which included transcripts of wiretapped telephone calls, photographs of seized cocaine, and testimony from three co-conspirators and several FBI special

4

agents -- showed that Ramos was connected to a cocaine
trafficking organization (the "Duverge organization") operated
by two brothers, Rafael and Francisco Duverge.  Between 1992 and
1998, Ramos regularly ordered and received shipments of five to
ten kilograms of cocaine from the Duverges for re-sale to his
own customers, and also occasionally served as a lookout for the
Duverges' drug transactions.  The defendant called one witness,
a Department of Motor Vehicles investigator, who testified that
Ramos's New York driver's license was renewed in January 2003
and that the renewal application did not contain any false
information.  The jury returned a verdict of guilty on the sole
count of the indictment on March 8, 2006.  On June 14, 2006,
Judge Kram sentenced Ramos to the mandatory minimum term of
imprisonment of 20 years, a term of supervised release of 10
years, and a $100 special assessment.

Ramos filed a timely appeal in which he argued that the
court erred by denying his pretrial motion to dismiss.  Ramos
contended that the court had improperly relied on certain
statements made by Ramos to Pretrial Services concerning his
whereabouts between 1998 and 2004.  The Court of Appeals
affirmed the conviction by summary order on February 11, 2008.
On June 9, 2008, the Supreme Court denied a petition for a writ
of certiorari.  On April 7, 2009, Ramos filed this timely § 2255
petition.

DISCUSSION

Under 28 U.S.C. § 2255, "a federal prisoner may move the sentencing court to vacate, set aside, or correct the sentence on the ground that such sentence was illegally imposed." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009). Ramos asserts that defense counsel provided ineffective assistance to him in connection with pretrial, trial, and sentencing proceedings. Ramos identifies eight grounds of ineffective assistance in his § 2255 petition and supporting papers.[1]

The Supreme Court has established a two-part test for evaluating claims of ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687 (1984); accord Puglisi, 586 F.3d at 215. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." Id. While the defendant must prove both deficient performance and prejudice, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same

---

[1] Six grounds are specifically enumerated in Ramos's § 2255 petition, with two more asserted in the supporting papers.

6

order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Under Strickland, "[a] criminal defendant has a high burden to overcome to prove the deficiency of his counsel." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006). With respect to the first prong, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," as "[t]here are countless ways to provide effective assistance in any given case." Strickland, 466 U.S. at 689. Moreover, "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir. 2009). The performance inquiry examines the reasonableness of counsel's performance "from counsel's perspective at the time" and "considering all the circumstances." Strickland, 466 U.S. at 688, 689.

The petitioner's burden with respect to prejudice is similarly stringent. Ramos must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; accord Puglisi, 586 F.3d at 215. In applying this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; accord Wilson v. Mazzuca, 570 F.3d 490, 506-07 (2d Cir. 2009). "[T]he ultimate focus of

inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 696.

When briefing on a § 2255 petition reveals contested issues of material fact, an evidentiary hearing is held. "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). "To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." Puglisi, 586 F.3d at 213 (citation omitted). "[A] motion supported by a sufficient affidavit including detailed and controverted issues of fact warrants a hearing, but bald allegations unsupported by evidentiary facts do not." Id. (citation omitted). "'[I]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion.'" Id. (quoting Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b), 28 U.S.C. § foll. 2255).

For seven of the eight asserted grounds of ineffective assistance, no hearing was necessary to decide the merits of

Ramos's petition.  For the first seven grounds, allegations made by Ramos in his petition and supporting papers are assumed to be true for the purpose of deciding this petition to the extent that those allegations are consistent with the "files and the records of the case."  28 U.S.C. § 2255(b).  On the eighth ground, an evidentiary hearing was held on April 16, 2010 to develop a record and resolve contested questions of fact.

I.   Counsel's Failure to Assert a Violation of Ramos's Right to a Speedy Trial Based on the Post-Arrest Period

Ramos contends that, in filing his February 6 motion to dismiss grounded on the five-and-a-half-year delay between indictment and arrest (the "pre-arrest delay"), defense counsel should have asserted that the subsequent delay between arrest and trial (the "post-arrest delay") violated the Speedy Trial Act as well.  Ramos states that he had advised counsel of his belief that there was a speedy-trial violation based on the post-arrest delay, and that counsel then assured him he would "challenge that portion of [his] incarceration."  Ultimately, however, counsel did not challenge the post-arrest delay in the February 6 motion, nor at the speedy trial hearing held on February 17, both of which addressed only the pre-arrest delay. Ramos asserts that the trial record reveals that neither counsel nor the court paid attention to his argument that the Speedy

Trial Act was violated by the post-arrest delay.[2]

"When, as in this case, a plea of guilty is entered but later withdrawn, the defendant shall be deemed indicted on the day the order permitting withdrawal of the plea becomes final, thereby starting the seventy-day clock."  United States v. Solon, 596 F.3d 1206, 1214 (10th Cir. 2010) (quoting 18 U.S.C. § 3161(i)); see also United States v. Solorzano-Rivera, 368 F.3d 1073, 1078-79 (9th Cir. 2004) (explaining the operation of § 3161(i)).  Thus, the pertinent date for determining the existence of any Speedy Trial Act violation based on post-arrest delay is January 20, 2005, the date when the court granted Ramos's motion to withdraw his guilty plea.[3]

Thereafter, three lengthy periods of pre-trial delay occurred that the Government concedes were not covered by an exclusion of time under the Speedy Trial Act.  The first such period, lasting 55 days from January 21 to March 16, 2005,

---

[2] A review of the transcripts reveals that, on February 28, 2006, counsel raised Ramos's concern regarding a potential post-arrest Speedy Trial Act violation with the court.  The court declined to entertain Ramos's concerns, concluding that they were without merit.

[3] In its opposition brief, the Government assumes that the speedy trial clock began running on the date of Ramos's first appearance following arrest, which was March 3, 2004.  The Government calculates that a total of 32 days elapsed on the speedy trial clock following Ramos's arrest until his guilty plea on June 9, 2004.  Because the speedy trial clock was reset by Ramos's withdrawn plea pursuant to 18 U.S.C. § 3161(i), however, the unexcluded days prior to the guilty plea need not be counted.

followed the January 20 Order granting Ramos's motion to
withdraw his plea.  The January 20 Order scheduled a conference
for February 23, which was adjourned several times and
ultimately held on March 16.  At the March 16 conference,
Ramos's trial was set down for July 18, and time was excluded by
oral order through that July date.

The second period lasted 44 days from July 19, 2005 -- the
day after the previous exclusion expired -- until August 31.
Ramos's counsel was unavailable for much of August 2005.  On
August 31, Judge Kram issued a memo endorsement re-scheduling
trial for December 5 and excluding time until then in order to
permit the parties to conduct plea negotiations and, if
necessary, prepare for trial.[4]

The last period, spanning 63 days from December 6, 2005 to
February 6, 2006, was occasioned by several requests for
adjournment by the parties, each of which was granted by the
court without expressly finding that time should be excluded in

---

[4] The Government calculates that the speedy trial clock stopped
running on August 21, owing to Judge Kram's endorsement of a
letter dated August 21, 2005 requesting the exclusion of time
"between today and December 5."  Because exclusions of time in
the interest of justice can only be made prospectively, the
exclusion began on the date that Judge Kram issued her
endorsement, which was August 31.  See United States v. Breen,
243 F.3d 591, 596 (2d Cir. 2001) ("[T]he decision to grant an
ends-of-justice continuance must be prospective, not
retroactive; an order granting a continuance on that ground must
be made at the outset of the excludable period." (citation
omitted)).

the interest of justice.  First, by Order of November 21, 2005, the court postponed trial from December 5 until January 3. Then, by Order of December 8, the court granted defense counsel's request for a further adjournment until January 30.[5] By Order of January 11, the court adjourned trial until February 13, this time at the Government's request.  The final period of unexcluded time concluded on February 6, when Ramos moved to dismiss the indictment, thereby triggering the statutory exclusion for pending pretrial motions pursuant to 18 U.S.C. § 3161(h)(1)(D).  Throughout this period, plea negotiations between Ramos's counsel and the Government were ongoing, ultimately producing a plea offer that Ramos did not accept.

The above three periods resulted in a total of 162 days, or more than five months, of unexcluded time during the thirteen months that followed the withdrawal of Ramos's guilty plea.  The Speedy Trial Act, 18 U.S.C. §§ 3161(c)(1) & 3161(i), provides that a criminal defendant's trial must begin within seventy days

---

[5] Defense counsel's December 1 letter indicated that defendant "agree[d] to an exclusion under the Speedy Trial Act for the four-week extension" sought by counsel.  This acknowledgment of consent does not toll the speedy trial clock, however, because the Act requires that any ends-of-justice continuance be expressly made.  See Zedner v. United States, 547 U.S. 489, 503-04 (2006) (no exclusion of time even if "petitioner's express waiver induced the district court to grant a continuance without making an express ends-of-justice finding"); accord United States v. Culbertson, 598 F.3d 40, 47 (2d Cir. 2010) ("[N]or is a defendant's acquiescence to a continuance sufficient compliance with the Act for an ends-of-justice exclusion in the absence of specific findings.").

of the date that a guilty plea is withdrawn.  As such, the 162-day delay until Ramos's trial exceeded the amount of time permitted under the Speedy Trial Act.

This violation of the Speedy Trial Act notwithstanding, the Government contends that Ramos cannot show any prejudice from defense counsel's failure to seek dismissal of the indictment based on the post-arrest delay.  The Government asserts that, even if the indictment were dismissed, the dismissal would have been without prejudice to re-indictment within six months as permitted by 18 U.S.C. § 3288.[6]  In determining whether dismissal on speedy trial grounds should be with or without prejudice, the Speedy Trial Act directs a court to consider, <u>inter alia</u>, "the

---

[6] The Government also argues that the speedy trial clock never began running against Ramos because two indicted co-defendants remained fugitives.  The Government relies on <u>United States v. Pena</u>, 793 F.2d 486 (2d Cir. 1986), wherein the Court of Appeals held that "cases involving multiple defendants are governed by a single speedy trial clock, which begins to run with the clock of the most recently added defendant, and [] delay attributable to any one defendant is charged against the single clock, thus making the delay applicable to all defendants."  <u>Id.</u> at 489. Under 18 U.S.C. § 3161(h)(6), the speedy trial clock may be tolled for "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." The Government argues that, because Ramos did not seek a severance of trial, the § 3161(h)(6) exclusion applied and "the non-appearance of [Ramos's co-defendants] prevented any time from running on Ramos's speedy trial clock."  The Government's reading of the statute would essentially deprive an arrested defendant of his rights under the Speedy Trial Act whenever a co-defendant is a fugitive.  While <u>Pena</u> permits the clock to be restarted when a co-defendant appears in the case, it does not relieve the court of its obligation to comply with the statute whenever a co-defendant remains a fugitive.

seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a re-prosecution on the administration of [the Speedy Trial Act] and on the administration of justice." 18 U.S.C. § 3162(a)(2).  In addition, a court may also weigh prejudice to the defendant. United States v. Wilson, 11 F.3d 346, 352 (2d Cir. 1993).

The Government is correct that any motion to dismiss the indictment because of post-arrest delay would have been granted without prejudice, as an analysis of the § 3162(a)(2) factors makes plain.  First, Ramos was charged with a serious offense. See, e.g., United States v. Taylor, 487 U.S. 326, 328, 337-38 (1988) (charge of conspiracy and possession with intent to distribute 400 grams of cocaine considered "serious" offense for Speedy Trial Act purposes).  Second, although any violation of the Speedy Trial Act is itself serious, Ramos only objected to the delay on the eve of trial, undercutting any showing of prejudice.  Indeed, the record suggests that time could properly have been excluded pursuant to § 3161(h)(7) during the latter two periods of delay given the unavailability of defense counsel, the protracted plea negotiations, and the court's desire to confirm that Ramos truly preferred to stand trial rather than plead guilty again.  Moreover, rather than alleging that he was prejudiced by the delay, Ramos now argues in his reply that defense counsel should have requested still more time

14

to prepare for trial.  Third, there is no evidence that the post-arrest delay was occasioned by "a pattern of dilatory practices" or malfeasance by the Government, and as such, dismissal with prejudice would not be necessary in order to effectuate the purposes of the Speedy Trial Act.  Wilson, 11 F.3d at 352 (citation omitted).  Finally, re-prosecution of Ramos would be in the interests of justice.  Because Ramos would almost certainly have been successfully re-prosecuted if the indictment were dismissed, Ramos cannot show that his counsel's failure to litigate the post-arrest delay caused him any prejudice for Strickland purposes.

## II.  Counsel's Failure to Argue at Trial That Ramos Was Not a Member of the Conspiracy

Ramos asserts that defense counsel should have argued at trial that Ramos was merely a customer of the Duverge organization and not a co-conspirator.  "[T]he existence of a buyer-seller relationship does not itself establish a conspiracy."  United States v. Hawkins, 547 F.3d 66, 72 (2d Cir. 2008).  "The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy."  Id. (citation omitted). Nevertheless, "where there is additional evidence showing an

agreement to join together to accomplish an objective beyond the sale transaction, the evidence may support a finding that the parties intentionally participated in a conspiracy." Id.

Ramos's argument must be rejected for failure to show either any lapse in representation by counsel or prejudice. Defense counsel did attack the Government's evidence at trial on the theory that there was insufficient evidence that Ramos was a distributor of drugs or had his own network of customers. Counsel argued throughout Ramos's trial that the three cooperating witnesses were unreliable insofar as their testimony implicated Ramos as a co-conspirator, and counsel sought to impeach their credibility on cross-examination.

In any event, even if defense counsel had not made this specific argument at trial, Ramos has also not shown any prejudice. The evidence that Ramos was a repeated purchaser of kilogram-sized quantities of cocaine came not just from the co-conspirators' testimony at trial, but also from the tape recordings. In addition, there was evidence that Ramos provided occasional assistance to the Duverge organization by acting as a look-out.[7] Where, as here, there is evidence of "advanced planning among the alleged co-conspirators to deal in wholesale

---

[7] In his reply, Ramos concedes that Rafael Duverge testified at trial that Ramos "used to buy drugs from him to sell it to his [Ramos's] own customers" and that Ramos "used to advise [the conspirators] if someone strange came around the area."

quantities of drugs obviously not intended for personal use[,] .
. . . the participants in the transaction may be presumed to
know that they are part of a broader conspiracy." Id. (citation
omitted).

### III. Counsel's Failure to Object to Tape-Recorded Statements of a Deceased Co-Conspirator

Ramos contends that defense counsel should have objected at
trial to the admissibility of two tape-recorded conversations
involving Santo De La Cruz ("De La Cruz"), a co-conspirator who
died sometime after 1998 and before 2006.  The conversations,
which occurred on July 10, 1998 and September 2, 1998, were
intercepted pursuant to court-ordered wiretaps.  In the first
conversation, between Ramos and De La Cruz, the two appeared to
discuss a customer of Ramos's named Jose.  The second
conversation was between De La Cruz and Jose Tineo ("Tineo"),
the latter a major narcotics supplier who testified at trial.
In the conversation, Tineo and De La Cruz discussed narcotics
debts that Ramos and De La Cruz owed to Tineo and the
possibility that Ramos would settle his debt with Tineo by
transferring ownership of a house.  Ramos asserts that the
admission of these recordings into evidence and related
testimony by Tineo constituted a violation of his confrontation
rights under Crawford v. Washington, 541 U.S. 36 (2004).

Ramos cannot show prejudice from counsel's failure to object to the admission of these two conversations at his trial. There was substantial evidence that De La Cruz and Ramos were co-conspirators in the conspiracy charged in the indictment.  As a result, their tape-recorded conversations were properly admitted as statements made by the defendant's co-conspirators in furtherance of the conspiracy.  See In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 137 (2d Cir. 2008) ("[A] statement is not hearsay if the statement is offered against a party and is made by a coconspirator of a party during the course and in furtherance of the conspiracy." (quoting Fed. R. Evid. 801(d)(2)(E)) (alteration omitted)).  The admission of such a statement does not violate the Confrontation Clause because, "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial." United States v. Logan, 419 F.3d 172, 178 (2d Cir. 2005); see also United States v. Stewart, 433 F.3d 273, 291-92 (2d Cir. 2006).

Ramos also objects that Tineo was permitted at trial to explain the meaning of the September 2 conversation.  Ramos argues that "[b]y using the cooperating witness Tineo to talk about what was meant to be said by De la Cruz in both audiotapes," his Confrontation Clause rights were violated. Ramos's argument is incorrect.  First, a review of the trial transcripts shows that Tineo was only questioned concerning the

meaning of statements that he, not De La Cruz, had made during the conversation.   Second, Tineo appeared at trial and was cross-examined by defense counsel concerning that exact testimony.   Because Tineo was available for cross-examination, no Crawford violation occurred.

### IV.   Counsel's Failure to Provide Ramos with a Set of the 3500 Material

Ramos next asserts that counsel failed to ensure that the Government turned over all 3500 material in a timely manner before trial, and then once it was finally produced, neglected to provide Ramos with his own copy.[8]   Ramos also argues that, because of the late production of 3500 material, counsel had an insufficient amount of time to prepare for trial.   Ramos further complains in his reply that defense counsel spent only "a few hours" discussing the 3500 material with him and should have spent more time given the volume of the material.

A review of the record reveals that counsel was supplied with the 3500 material on a rolling basis after February 8, 2006, with material for one Government witness not arriving

---

[8] The record reflects that, at a conference held on February 28, 2006, counsel informed the court that Ramos had expressed dissatisfaction to him that counsel had not yet translated for Ramos all of the 3500 material.

until Saturday, February 25.[9]  According to defense counsel,
after receiving a "voluminous amount of 3500 material for the
Government's witnesses," he "met with Mr. Ramos, reviewed the
material with him, and explained the substance of the documents
to Mr. Ramos."

Notwithstanding Ramos's dissatisfaction concerning the
disclosure, review, and translation of 3500 material prior to
trial, Ramos has failed to show any prejudice.  Ramos does not
explain what would have happened differently if Ramos had been
provided with his own set of 3500 material or if he had spent
more hours discussing that material with counsel.  For instance,
Ramos does not identify any line of cross-examination suggested
by the 3500 material that could have been -- but was not --
exploited at trial by counsel.  Ramos also does not identify any
portion of the 3500 material that required further explication
by Ramos in order for counsel to fully understand its
implications and develop an appropriate defense at trial.  Thus,
Ramos's complaints about the 3500 material fail to show a
constitutional violation.

---

[9] The transcript from a February 27, 2006 conference reflects
that defense counsel told the court: "The government sort of
piecemeal gave me the 3500 material.  I got the material
regarding agent Chaves on Saturday afternoon."

V.  Counsel's Failure to Negotiate a Plea Agreement Premised on
Ramos's Status as a Customer

Ramos asserts that defense counsel should have negotiated a

plea agreement with the Government during trial after counsel

learned that Ramos was "just a customer" of the conspiracy.

Ramos has failed to show either a deficiency in counsel's

performance or prejudice from this supposed error.  As already

explained, there was more than sufficient evidence introduced at

trial to support the jury's finding that Ramos was a co-

conspirator of the Duverge organization and not merely its

customer.  As a consequence, there is no basis to conclude that

defense counsel could have succeeded in any effort to negotiate

with the Government a plea of guilty premised on Ramos's lack of

membership in the conspiracy.

VI.  Counsel's Failure to Challenge the Prior
Conviction at Sentencing

Ramos also asserts ineffective assistance of counsel

relating to his sentencing on June 14, 2006.  At sentencing, the

court took note of his prior narcotics felony -- the March 1991

state-court conviction for attempted criminal possession of a

controlled substance -- and explained that, as a result, Ramos

was "subject to a mandatory sentence of 240 months

imprisonment."  Under the pertinent statute, the court

ordinarily must inquire whether the defendant affirms or denies

21

the conviction listed in a prior felony information and inform him that if he wishes to contest that conviction, he must do so before sentence is imposed or else waive his right to challenge it.  21 U.S.C. § 851(b).  Ramos contends that defense counsel should have objected when the court failed to inquire whether Ramos contested the existence of the 1991 narcotics offense. Ramos also faults counsel for relying on Ramos's rap sheet and the Presentence Report for information about Ramos's prior conviction instead of obtaining the original state court records and confirming the existence of the conviction firsthand.

Ramos has failed to show that he was prejudiced by defense counsel's failure to object to his prior felony conviction. First, the statute includes a limitations period that precludes any challenge to the validity of a prior conviction occurring more than five years before the filing of the prior felony offender information.  21 U.S.C. § 851(e).  Second, Ramos does not dispute that he was previously convicted of the 1991 felony, does not argue that the Presentence Report was inaccurate, and does not allege that his sentencing outcome would have been different if counsel had actually searched the state court's records.  As such, Ramos cannot show that counsel erred in failing to object to the court's consideration of that prior felony.

VII.  Counsel's Decision to Call Ramos's Daughter as a Witness

     Although he does not formally enumerate this ground in the
petition, Ramos also appears to argue that counsel's decision to
call Ramos's daughter as a witness at the speedy trial hearing
constituted ineffective assistance of counsel.  At the hearing,
Ramos's daughter testified that Ramos had been living in his New
York apartment, and therefore was not a fugitive in the
Dominican Republic, during the five-and-a-half years following
indictment and prior to arrest.  Ramos represents that counsel
did not consult with Ramos prior to deciding to call his
daughter as a witness, and asserts his belief that Ramos's
consent was necessary because the pertinent events transpired
while his daughter was still a minor.

     Ramos has been unable to show either a deficiency in
counsel's performance or any prejudice from counsel's decision
to call his daughter as a witness.  The decision as to which
witnesses to call is ordinarily a matter of strategy left to
counsel, and "counsel's decision as to whether to call specific
witnesses . . . is ordinarily not viewed as a lapse in
professional representation."  United States v. Best, 219 F.3d
192, 201 (2d Cir. 2000) (citation omitted).  "[Ramos] has not
shown that his counsel's decisions were anything other than
strategic.  Nor has he shown that different choices would have
had any likelihood of altering the outcome . . . ."  Gibbons,

23

555 F.3d at 122.  Finally, Ramos does not point to any testimony given by his daughter that was material to the court's decision to deny his motion to dismiss.

### VIII.  Counsel's Failure to Advise Ramos of a Plea Offer

Finally, in his reply, Ramos asserts that counsel failed to advise him that the Government had offered him the opportunity to plead guilty without the filing of a prior felony information.  Ramos asks: "How can petitioner reject an offer of 10 years, if he knows that going to trial will give him no less than 20 years?  It makes no sense to think petitioner would have rejected that offer . . . ."  Ramos further represents that he never saw the plea offer in writing and does not recall signing to reject it.[10]

A hearing was held on April 16, 2010 to develop a factual record concerning Ramos's allegation that counsel failed to advise him of the plea offer.  Ramos was represented at the hearing by CJA counsel pursuant to 18 U.S.C. § 3006A(a)(2)(B).  Both sides offered documentary records into evidence, including transcripts from the proceedings before Judge Kram, counsel's CJA reimbursement voucher and time records, and some of

---

[10] Although Ramos acknowledges that he had earlier moved to withdraw his plea of guilty, he explains that he had only done so because he wished an opportunity to review the Government's discovery material, not because he definitively wished to proceed to trial.

counsel's correspondence from 2004.

The Government called Ramos's trial counsel as its sole witness.  Counsel testified that, prior to trial, he had engaged in plea negotiations with prosecutors both before and after counsel filed the February 6 motion.  Those discussions yielded an offer whereby Ramos would plead guilty to conspiracy to distribute five kilograms and more of cocaine, and the Government would abstain from filing a prior felony information, thereby resulting in only a 10-year mandatory minimum term of imprisonment.  Counsel stated that he presented this plea offer to Ramos, encouraged him to accept it, and advised him that the Government would likely file a prior felony information if Ramos rejected the offer, an act which would have the effect of doubling the mandatory minimum.  Counsel testified that Ramos understood the plea offer, but chose to reject it and proceed to trial.  In obedience to those wishes, counsel communicated Ramos's decision to the Government and prepared for trial. Counsel also testified that, when the Government filed the prior felony information on February 17 at Ramos's speedy trial hearing, Ramos expressed no surprise or concern.

Following testimony by his trial counsel, Ramos chose to testify as a witness on his own behalf.  Ramos testified that counsel never explained to him what a prior felony offender information was, never told him that he faced the possibility of

an enhanced mandatory minimum sentence, and never warned Ramos
that the offer to plead guilty to a charge carrying only a ten-
year mandatory minimum would expire once the Government filed a
prior felony offender information.  Ramos testified that he was
under the impression that he could plead guilty and receive a
ten-year sentence right up until the first day of trial, and
stated that he had told counsel of his intent to plead guilty
"one or two days before" trial was scheduled to begin.

     At the conclusion of the hearing, various factual findings
were made on the record.[11]  The Court concluded, inter alia, that
counsel's testimony -- which was corroborated by the time
records contained in his CJA voucher -- was credible, while
Ramos's testimony was not credible.[12]  Counsel discussed the plea
offer with Ramos in detail at least twice: first, in their joint
meeting with the Government at the United States Attorney's
Office on February 2, 2006 and, second, in a private meeting at

_____

[11] The findings at the conclusion of the hearing constitute the
Court's complete statement of its findings.

[12] For example, Ramos's testimony that he thought he could accept
the plea offer until the eve of trial contradicted the statement
made in his affidavit that he had never been informed of the
plea offer.  Likewise, Ramos's testimony that he did not plead
guilty by the February 17 deadline because he wanted to plead
guilty "one or two days before" the start of trial is
inconsistent with the conceded fact that Ramos never
communicated any desire to the court to plead guilty instead of
standing trial.  See also February 28 Opinion, 420 F. Supp. 2d
at 247-48 (rejecting as unreliable certain affidavit testimony
by Ramos in connection with the February 6 motion).

the Metropolitan Detention Center on February 15, 2006.  At the
February 15 meeting, counsel discussed with Ramos the fact that
the Government had requested a response to its plea offer by
February 17, the date of Ramos's speedy trial hearing.  The
evidence at the hearing showed that counsel properly advised
Ramos of the plea offer, its terms, and the consequences of
declining the deal.  Once Ramos indicated he would decline the
offer -- apparently based on his misplaced confidence that
Ramos's co-conspirators would not cooperate in testifying
against him at trial -- counsel thereafter acted in accordance
with Ramos's request.  "Deferring to the wishes of a client does
not constitute ineffective assistance of counsel."  In re
Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 177,
196 (2d Cir. 2008).  As such, Ramos's claim of ineffective
assistance of counsel on this ground cannot succeed.

CONCLUSION

    For the foregoing reasons, Ramos's § 2255 petition is
denied.  In addition, the Court declines to issue a certificate
of appealability.  Ramos has not made a substantial showing of a
denial of a federal right pursuant to 28 U.S.C. § 2253(c), and
appellate review is therefore not warranted.  Love v. McCray,
413 F.3d 192, 195 (2d Cir. 2005).  The Court also finds pursuant
to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would

not be taken in good faith.  Coppedge v. United States, 369 U.S.

438, 445 (1962).  The Clerk of Court shall close the case.

    SO ORDERED:

Dated:    New York, New York
        May 10, 2010

                                DENISE COTE
                   United States District Judge

28

COPIES MAILED TO:

Mario Ramos
#52120-054
Low Security Correctional Institution, Allenwood
P.O. Box 1000
White Deer, PA 17887

Justin Anderson
Assistant United States Attorney
U.S. Attorney's Office
1 St. Andrew's Plaza
New York, NY 10007

Bobbi Sternheim, Esq.
Rochman Platzer Fallick Sternheim Luca & Pearl
LLP
156 Fifth Avenue, Suite 823
New York, NY 10010